516

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 2939 | **DATE** | 7/3/2003 |
| **CASE TITLE** | Romona Donelson vs. City of Chicago | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order. Defendant's motion for summary judgment [23-1] is granted with respect to Plaintiff's claims for sex discrimination, hostile work environment and retaliation. Judgment is entered in favor of the defendant and against the plaintiff. This case is hereby dismissed with prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | JUL 08 2003 | |
| ✓ | Docketing to mail notices. | | date docketed | 33 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT | | |
| RO | courtroom deputy's initials | 03 JUL -7 PM 4:35 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

| | |
|---|---|
| ROMONA DONELSON, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | No. 02 C 2939 |
| v. ) | |
| ) | Judge Ruben Castillo |
| CITY OF CHICAGO, ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Romona Donelson ("Donelson") sued her employer, the City of Chicago ("City"), for gender discrimination, harassment in the form of a hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* In particular, Donelson claims that General Foreman Dennis Sepanik ("Sepanik") assigned her work duties in a discriminatory manner, habitually spoke with her in a hateful tone of voice and denied her requests for paid leave time and for a promotion. Currently before this Court is the City's motion for summary judgment on all counts. After viewing the facts in the light most favorable to Donelson, we conclude that there are no genuine issues of material fact, and accordingly grant the City's motion for summary judgment. (R. 23-1.)

## RELEVANT FACTS

Romona Donelson was hired by the City on March 16, 1988. (R. 20, Def.'s Am. Answer ¶ 13.) She became a seasonal motor truck driver ("MTD") with the Department of Aviation ("DOA"), assigned to O'Hare Airport, on or about November 16, 1995, and became a probationary MTD on or about September 16, 1997. (*Id.* at ¶ 6.) She remains employed by the City.

1

MTDs perform a variety of truck-driving tasks ("details") on the airfield. These include ramp detail (an on-call assignment), the "magnet" (used to remove debris from the airfield), sweepers, and various escort details, which constitute approximately 90% of the MTDs' summertime work. (R. 23, Def.'s Facts ¶¶ 13-14.) MTDs mainly escort: (1) construction contractors at O'Hare; (2) Hudson General, the cargo fuel contractor; (3) surveyors; (4) City electricians performing lighting work; (5) Preform, a contractor that repaints stripes and signs; and (6) Rossi, a contractor that does various work including hydroseeding. (*Id.* at ¶ 15.) MTDs do not physically assist the contractors, (*id.* at ¶ 16), and receive the same pay regardless of the details to which they are assigned, (*id.* at ¶ 17). The MTDs who are assigned as lead drivers during the winter snow season, however, do receive extra pay. (*Id.*)

During the snow season, which runs from November 1 of each year through April 15 of the following year, some non-seasonal MTDs are selected to act as lead drivers. (*Id.* at ¶ 18.) Leads receive $1.50 per hour more than the regular MTDs for the entire winter season. (*Id.* at ¶ 21.) Generally, there are two to three leads per convoy of trucks, one in front (front lead), one bringing up the rear (back lead), and one in the middle of the longer processions. (*Id.*) The front lead, usually the more experienced lead, is responsible for leading convoys of up to 20 vehicles or more in de-icing and removing snow from runways, taxiways and roadways while following the directions of airport operations and the tower. (*Id.* at ¶¶ 19, 25.) Leads may work a longer shift than MTDs, beginning work at 6:30 p.m. when snowfall is expected (rather than at the usual time of 11:00 p.m.), and continuing until the end of the night shift at 7:00 a.m. (*Id.* at ¶ 23.) Lead drivers also may perform regular MTD assignments during the winter months as needed, for which they also receive elevated pay. (R. 24, Def.'s Mot., Ex. 6, Hanrahan Aff. ¶ 4.)

2

Prior to each snow season, the City accepts applications for lead positions from all non-seasonal MTDs.

On any given shift, assignments (including details, "lead" designations where applicable, and standbys) are determined by the foremen overseeing the MTDs and recorded in the Dispatchers Shift Logs ("logs") in the ordinary course of business. (*Id.*, Hanrahan Aff. at ¶ 3.) The logs and assignments are reviewed by the General Foreman, who supervises the foremen on the shift. (*Id.* at ¶ 2.) Donelson submits that the airport's operations staff provide the foremen with particulars on how long each detail is expected to last, the number of MTDs needed for each detail and whether any runway closures are needed. (R. 28, Pl.'s Add'l Facts ¶ 11.) The City denies this allegation, arguing that the foremen are generally *not* aware of the length of any particular detail, as it depends on the nature of the project, changing weather, runway closings and other factors. (R. 24, Def.'s Mot., Ex. 5, Miceli Dep. at 9; Ex. 6, Hanrahan Aff. ¶ 10.)

In 1999 Donelson was working the night shift as an MTD. (*Id.*, Ex. 1, Donelson Dep. Vol. I at 12.) Sepanik, then a foreman, became one of her supervisors sometime around April 1999. (*Id.* at 7.) During 1999, Donelson filed several charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR"), specifically directed against Sepanik, alleging harassment based on race and sex, hostile work environment and retaliation. (*Id.*, Ex. 4., Settlement Agreement ¶ 1.) Donelson subsequently sued the City under Title VII. (*Id.*) The parties ultimately settled the case, pursuant to a settlement agreement in which Donelson agreed to waive all causes of action occurring on or before the date of the October 25, 2000 settlement. (*Id.* at ¶¶ 5, 7, 15.) Sepanik was transferred to the day shift in February 2000, while Donelson has continued to work the

3

night shift without interruption from the execution of the settlement agreement to the present. (R. 23, Def.'s Facts ¶ 10.)

On September 25, 2000, Donelson applied to be a lead driver for the 2000-2001 snow season. (*Id.* at ¶ 83.) Mark Murphy, former General Foreman (now deceased) and Robert Duda, General Manager of Vehicle Services at O'Hare, selected the lead drivers for the 2000-2001 snow season. (R. 24, Def.'s Mot., Ex. 3, Duda Aff. ¶ 11.) Murphy and Duda jointly decided that Donelson "posed a safety risk," (*id.* at ¶ 12), because she had stated at a staff meeting in February or March 2000 that she did not feel comfortable "being air side," (*id.* Attach. B). Though Donelson's comment prompted Murphy to recommend her for re-certification, (*id.*), Donelson avers that she intended only to express concern about the differences in duties between the day shift and her regular night shift. (R. 28, Pl.'s Add'l Facts ¶ 16.) Regardless, she was not permitted to work airside as an MTD until she was re-certified to operate on the field. (R. 24, Def.'s Mot., Ex. 3, Duda Aff. ¶ 13.) While Murphy and Duda considered her bid for the lead position, neither questioned Donelson about her comment. Ultimately, Duda decided not to appoint Donelson as a lead driver because of her admitted discomfort on the airfield, the increased air traffic during times that lead drivers (but not MTDs) are potentially on shift (from 6:30 p.m. to 11:00 p.m.), the potentially dire consequences of a lead driver's mistake and "several complaints about [Donelson's] performance" (including a 1999 memo from Scpanik). (*Id.* at ¶¶ 13-17.)

On or before October 17, 2000, the list of selected lead drivers, which did not include Donelson, was posted on the wall outside of the dispatcher's office of the Automotive Maintenance Complex. (*Id.* at ¶ 10.) Among the MTDs selected to become lead drivers was

4

Lisa Tudisco, a female whom Donelson recalls in 1999 casually mentioning that she would be "quite nervous" if made a lead driver. (*Id.*, Ex. 1, Donelson Dep. Vol. III at 268.) Though Donelson worked on October 17, 18, and 21-25, she did not see the posting until November 6 or November 7, 2000, the day when she spoke to Murphy about not receiving the position. (R. 23, Def.'s Facts ¶ 85.) On January 3, 2001, Donelson filed a complaint with the EEOC, alleging discrimination on the basis of sex and retaliation. (R. 20, Def.'s. Am. Answer ¶ 8.) Specifically, she asserted that she was not selected as lead driver during the 2000-2001 snow season in retaliation for her 1999 EEOC filings and the resulting federal lawsuit. (R. 23, Def.'s Facts ¶ 7.)

Donelson did, however, become a lead driver during the 2001-2002 snow season. At that time, two shift foremen, Mario Miceli and a second Acting Foreman who varied, were assigned to the night shift. (*Id.* at ¶ 11.) Sepanik was officially appointed Acting General Foreman (replacing Murphy) on January 16, 2002. (R. 31, Def.'s Reply, Ex. 11, Duda Supp. Aff., Attach. B.) Sepanik, however, regularly began working the night shift on January 13, 2002.[1]

On January 22, 2002, Donelson left work sick. (*Id.* at ¶ 72.) When an MTD becomes ill at work, she is automatically recorded as "Sick/No Pay" unless she elects to use paid vacation time. (*Id.* at ¶ 75.) Because she felt ill at the time, Donelson did not ask to use vacation time

---

[1] The parties dispute the precise date upon which Sepanik began working the night shift. Donelson alleges that Sepanik began working the night shift on November 13, 2001, citing as corroboration both the City's logs and a memorandum to herself, dated November 21, 2001, that refers to Sepanik performing Acting General Foreman duties. (R. 28, Pl.'s Add'l Facts ¶ 1.) Although the logs from November 13, 2001 do show Sepanik's name, it is crossed out, (R. 24, Def.'s Mot., Ex. 6, Hanrahan Aff. Attach. A), and the DOA's official time-card records show that Sepanik worked only the day shift on November 13, (R. 31, Def.'s Resp. to Pl.'s Facts, Ex. 11, Duda Supp. Aff., Attach. A). And though it appears that Sepanik worked both the day and night shifts on November 21, 2001, the record is devoid of evidence that he worked the night shift on any other day until January 13, 2002. (*Id.*) The record is clear that Sepanik did not regularly begin working the night shift until January 13, 2002.

5

when she told Sepanik she was leaving work for the day. (*Id.* at ¶¶ 72-73.) Donelson subsequently left a message with the dispatcher requesting to use vacation time, but she did not speak directly to Sepanik or to any other foreman. (*Id.* at ¶ 73.) Though Donelson has no personal knowledge of whether Sepanik ever got the message, (*id.* at ¶ 74), it was common practice to leave such messages with the dispatcher and she knew of no other time when the dispatchers failed to forward a message to the foremen, (R. 28, Pl.'s Add'l Facts ¶ 13). Donelson was recorded as "Sick/No Pay" for January 22, 2002. (R. 23, Def.'s Facts ¶ 71.)

On January 24, 2002, Donelson filed another complaint with the EEOC, alleging sex discrimination and retaliation. (R. 20, Def.'s Am. Answer ¶ 6.) In relevant part, the January 2002 complaint alleges that Sepanik interfered with Donelson's job performance by repeatedly making humiliating comments, by distributing job assignments to her in an unfair manner and by intentionally causing her emotional distress. (R. 29, Donelson Aff., Ex. A.)

It is clear from the record that Donelson and Sepanik have not enjoyed a pleasant working relationship—Donelson has repeatedly filed complaints regarding Sepanik's behavior towards her. (R. 28, Pl.'s Add'l Facts ¶ 18.) Since her initial complaint against him in 1999, Donelson contends that Sepanik has treated her in a derogatory manner. (R. 23, Def.'s Facts ¶ 77.) Donelson claims that whenever Sepanik speaks to her, it is with a "tone of hatred in his voice." (R. 28, Pl.'s Add'l Facts ¶ 20.) In contrast, Sepanik consistently speaks "with a pleasant and helpful voice" to all other employees. (R. 28, Pl.'s Add'l Facts ¶ 20.) Donelson, however, admits that Sepanik has never uttered openly hostile words to her, nor has he mentioned her gender, her race or her complaints about him. (R. 23, Def.'s Facts at ¶ 78.)

6

Although Donelson had been complaining about the rotation of her details since 1994, she admits that the alleged discriminatory actions in this case occurred shortly after Sepanik began working the night shift, on January 13, 2002. Donelson felt she was more frequently assigned less-desirable details than other MTDs—*e.g.*, those that last the full eight-hour shift (rather than only two or three hours) and those that involve moving around the airfield a lot, which requires monitoring the radio and being alert to air traffic. (R. 23, Def.'s Facts ¶¶ 45, 52.) Foreman Miceli usually provided Donelson her assignments. (R. 28, Pl.'s Add'l Facts ¶ 6.) Shortly after Sepanik began working the night shift, however, he purportedly controlled Donelson's work detail. (R. 28, Pl.'s Add'l Facts ¶¶ 6, 68.)

On April 13, 2002, Sepanik asked Donelson to take the front lead position. (R. 23, Def.'s Facts ¶ 29.) The convoy that night consisted of two de-icer trucks, followed by a lead driver in the rear. (*Id.* at ¶ 32.) Sepanik explained to Donelson that when airfield traffic is slow and the weather is clear, it's "a good idea to try out being a front lead." (*Id.* at ¶ 30.) Because the winter season, and thus the program utilizing lead drivers, ended on April 15, this was perhaps the last opportunity Donelson would have to obtain the experience of front lead. (*Id.* at ¶ 31.) Although she accepted the front lead position on a few prior occasions, Donelson had never received any calls for assignments while working front lead. (*Id.* at ¶¶ 24, 28.) Because she did not feel comfortable assuming front lead responsibility, Donelson objected to leading the team that night. (*Id.* at ¶ 34.) When she informed Sepanik, he relieved her of the assignment. (*Id.*) Donelson believed that Sepanik first should have asked whether she felt comfortable taking the front lead. (*Id.*) In addition, she loosely recalls, but has no personal knowledge of, one lead

driver named Ann Rychek, who has never been assigned the front lead position despite several years as a lead. (R. 29, Donelson Aff. ¶ 21.)

Donelson contends that in April 2002 Sepanik denied Donelson's request to take a vacation in September 2002. (R. 23, Def.'s Facts ¶ 37.) Donelson appealed to General Foreman Richard Hanrahan, who also initially denied her request. (*Id.* at ¶ 38.) On April 15, Donelson, Sepanik and Hanrahan met to discuss the vacation request. (R. 24, Def.'s Mot., Ex. 1, Donelson Dep. Vol. I at 90-93.) Hanrahan explained that her request had been denied because three MTDs with more seniority were already scheduled for vacation at that time and DOA policy required a minimum number of available MTDs. (R. 23, Def.'s Facts ¶ 39.) Donelson responded that management had permitted shifts to operate shorthanded before (though she had no personal knowledge of a comparable situation), and that she stood to lose $1200, having paid for her vacation in advance. (R. 28, Pl.'s Add'l Facts ¶ 39.) Management arranged for another employee to trade vacation time with Donelson, so that she could have the requested days off. (*Id.* at ¶ 40.)

From October 2001 to October 2002, there were approximately three opportunities for MTDs to receive initial training on new equipment. (R. 23, Def.'s Facts ¶ 79.) The DOA generally selects a few individuals for initial equipment training sessions, who then train the other MTDs. (R. 24, Def.'s Mot., Ex. 1, Donelson Dep. Vol. II at 146). Usually males are selected for initial training, (*id.* at 145), although some female MTDs, specifically Charlotte McCue and Lisa Tudisco, have attended initial training, (R. 23, Def.'s Facts ¶ 80). Donelson has never attended an initial training session. (R. 24, Def.'s Mot., Ex. 1, Donelson Dep. Vol. II at

8

146.) The MTDs who attended initial training sessions, however, did train her on new equipment. (R. 23, Def.'s Facts ¶ 79.)

## LEGAL STANDARDS

Summary judgment is only appropriate where the record shows "that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We view all facts, and any legitimate inferences drawn therefrom, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Oates v. Discovery Zone*, 116 F.3d 1161, 1167 (7th Cir. 1997). Naturally, the non-moving party may not avoid summary judgment merely by denying her adversary's charges. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the opponent to a summary judgment motion must "file . . . a concise response to the movant's statement, . . . including, in the case of disagreement, specific references to . . . the record, and other supporting materials relied upon." *Oates*, 116 F.3d at 1165 (*quoting* L.R. 12(n), redesignated L.R. 56.1); *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000).

## ANALYSIS

### I.   Sex Discrimination Claim

Title VII dictates that an employer may not "discriminate against any individual . . . because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may present either direct or indirect evidence of discriminatory intent to succeed on an employment discrimination claim. *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 691 (7th Cir. 2001); *Bruno v. City of Crown Point, Ind.*, 950 F.2d 355, 361 (7th Cir. 1992). Donelson alleges no direct evidence of discrimination; thus we use the burden-shifting methodology outlined by the

Supreme Court in *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792, 802-03 (1973). Under the *McDonnell-Douglas* framework, the non-moving party first must make a *prima facie* case of disparate treatment. If successful, the burden shifts to the moving party to provide a legitimate reason for the disputed action. If the non-moving party cannot show that this legitimate reason was mere pretext for discrimination, the court must grant summary judgment. *See, e.g., Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002); *Oates*, 116 F.3d at 1171. In order to establish a *prima facie* case of employment discrimination, Donelson must demonstrate that: (1) she is a member of a protected class; (2) her job performance met legitimate employer expectations; and (3) only she suffered an adverse employment action that (4) other similarly-situated members of a non-protected class did not experience. *Traylor*, 295 F.3d at 788. If Donelson fails to establish even a single prong of her *prima facie* case, her claim cannot survive summary judgment. *Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 465 (7th Cir. 2002).

Donelson, as a woman, is a member of a protected class and thus satisfies the first prong of the test. With respect to satisfactory job performance, the second prong of the test, Donelson's superiors seemed skeptical of her leadership abilities on the airfield. Sepanik filed a performance complaint in October 1999, when Donelson mistakenly allowed a contractor to stray into a forbidden area, (R. 24, Def.'s Mot., Ex. 3, Duda Aff. ¶ 16), and Murphy was so aghast at Donelson's admission of discomfort on the airfield at a meeting in March 2000 that he immediately recommended her for re-certification, (*id.*, Duda Aff. Attach. B). Sepanik's performance complaint and Murphy's re-certification recommendation hint that Donelson's performance may have been sub-par at times. However, neither is sufficient to show that Donelson was not performing her MTD duties adequately at the time of Sepanik's alleged

adverse employment actions from January 13, 2002 to the present. *Karazanos v. Navistar Intern. Transport. Corp.*, 948 F.2d 322, 336 (7th Cir. 1991) (determining that, when evaluating the question of whether an employee was meeting an employer's legitimate employment expectations, the issue is not the employee's past performance but "whether the employee was performing well at the time of [her] termination."). Furthermore, the City proffers no evidence after March 2000, nearly two years prior to Sepanik's alleged discriminatory actions, that Donelson's performance was substandard. In addition, we are reluctant to give Sepanik's complaint, the only formal negative evaluation, undue significance. Thus, Donelson meets the second prong of the test.

Regarding the fourth prong of the test, more favorable treatment of similarly situated male employees, we find that the record does not support the conclusion that Sepanik treated Donelson any differently than a similarly situated male employee. A plaintiff presenting "only his own uncorroborated, conclusory statements that similarly situated co-workers were treated differently" does not survive summary judgment. *Oest*, 240 F.3d at 614 (*citing Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 377 (7th Cir. 1998)); *Cowan v. Glenbrook Sec. Servs., Inc.*, 123 F.3d 438, 446 (7th Cir. 1997). Donelson does not directly mention that Sepanik treated males any differently in any of her submitted documents; she simply testified that men were "usually" chosen for initial training on new equipment. (R. 23, Def.'s Facts ¶ 79.) This lone disparity does not establish that Sepanik treated similarly situated male employees more favorably. *Oest*, 240 F.3d at 614. Further, the record shows that some female employees, though not Donelson, *were* selected for initial training. (*Id.* at ¶ 80.)

Even if we assume that Donelson meets the first, second and fourth prongs of the *McDonnell* test, she cannot establish a *prima facie* case because none of alleged incidents, either separately or taken together, rise to the level of materially adverse employment actions. Donelson claims that she suffered an adverse employment action because Sepanik: (1) unfairly assigned or caused her to be assigned more onerous details than other MTDs; (2) usually selected males to train on new equipment; and (3) habitually spoke to her in a hateful manner. Although the Seventh Circuit defines adverse employment actions "quite broadly," *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996), an adverse action must still have some "tangible job consequence," *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998). While it would be impossible to create a comprehensive list, "a termination of employment; a demotion evidenced by a decrease in wage or salary; a less distinguished title; a material loss of benefits; significantly diminished material responsibilities; and a transfer to a new department with a loss of non-quantifiable benefits such as one's own office, business cards, and listings in professional directories" generally exemplify adverse employment actions. *Togha v. County of Cook*, 48 F. Supp. 2d 1104, 1109 (N.D. Ill. 1999) (*citing Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)).

First, Donelson has failed to prove how performing regular MTD duties had a "tangible consequence" on her job. Although the record is awash with detailed descriptions of MTD assignments and the manner in which they are (or are supposed to be) distributed, Donelson does not allege that Sepanik ever assigned her a detail that fell outside her job description. *Mangano v. Sheahan*, No. 00 C 3953, 2002 WL 1821738, at *21 (N.D. Ill. Aug. 7, 2002) (holding that "plaintiff cannot rely on the fact that she received difficult work assignments in unfamiliar

districts to show that she suffered an adverse employment action."). Second, because Donelson eventually received training on new equipment (as did all MTDs), her non-selection for initial training did not affect her ability to perform MTD duties and hence does not constitute an adverse action. *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002). Finally, while courts may consider a supervisor's tone of voice to flesh out the context of other actions, tone of voice alone is too nebulous to constitute evidence of harassment. *Minor v. Ivy Tech State College*, 174 F.3d 855, 858 (7th Cir. 1999) (expressing concern for employers' legal risk should a harassment case "get to a jury on the basis of . . . nonverbal, nontouching modes of signaling" such as tone of voice).

Courts recognize that treatment amounting to nothing more than "mere inconvenience or alteration of job responsibilities" does not establish an adverse action under Title VII, *Crady*, 993 F.2d at 136, nor does "everything that makes an employee unhappy" engender a Title VII claim, *Hilt-Dyson*, 282 F.3d at 465 (quoting *Smart*, 89 F.3d at 441). Because Donelson's complaints amount to simple unhappiness, not materially adverse employment actions, we find that she has not carried her *prima facie* burden and thus her sex discrimination claim fails.

## II. Hostile Work Environment Claim

The City moves for summary judgment on Donelson's claim of sex-based harassment in the form of a hostile work environment, an allegation raised in her complaint but not, significantly, reiterated in any subsequent documents. Though Donelson continuously avers in a somewhat nebulous manner that Sepanik "harassed" her, she provides no legal arguments in support of a hostile work environment claim and makes no serious effort to respond to the City's arguments against it. Accordingly, we find that she has abandoned her hostile work environment

13

claim. *See Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003) (deeming plaintiff's negligence claim abandoned because he failed to delineate it either in his district court brief in opposition to summary judgment or in his brief on appeal); *Laborer's Int. Union v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (stating that arguments not presented to the district court in response to summary judgment motions are waived) (citations omitted); *Oak Brook Hotel Co. v. Teachers Ins. and Annuity Ass'n of America*, 846 F. Supp. 634, 641 (N.D. Ill. 1994) (finding plaintiff's failure to defend particular claim in response to defendant's motion for summary judgment resulted in treating that claim as abandoned).

Even if Donelson had not abandoned her claim, we find that any workplace discomfort she may have experienced did not rise to the level of a hostile environment. A hostile environment is created by harassment that is sufficiently "severe and pervasive" so as to "alter the conditions of [the] victim's employment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). Relevant factors include "the frequency of the discriminatory conduct; the severity of the conduct; whether the conduct is physically threatening or humiliating or is merely an offensive utterance; and whether the conduct unreasonably interferes with an employee's work performance." *See, e.g., Dellert v. Total Vision, Inc.*, 875 F. Supp. 506, 510 (N.D. Ill. 1995) (*citing Harris v. Forklift Sys., Inc.*, 114 U.S. 17, 22 (1993)). Further, in order to prevail on a hostile work environment claim, the plaintiff must show that, considering "all the circumstances," *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2000), the harassment was both subjectively and objectively hostile, meaning both that the plaintiff found it hostile and that a reasonable person also would have found it so, *see, e.g., Haugerud*, 259 F.3d at 692 (*citing Harris*, 114 U.S. at 20-22). Here, no reasonable jury could find that Sepanik's

14

allegedly discriminatory actions were offensive. First, the work details to which he assigned Donelson did not interfere with her work performance because they were within the bounds of established MTD duties, and hence *part of* her work performance. Second, at worst Sepanik merely spoke to Donelson with a hateful tone; he never directly or indirectly threatened her. (R. 23, Def's Facts ¶ 78.) Most importantly, Donelson provides no evidence that Sepanik's treatment of her was due to her sex. And, as noted above, Donelson admits that Sepanik spoke to all other employees, presumably male and female alike, in a "pleasant and helpful" voice. Finally, Donelson also admits that Sepanik never made any sexual comments to her or comments about her gender. (R. 23, Def.'s Facts ¶ 78.) Although Donelson clearly found Sepanik's demeanor unpleasant, it does not constitute a hostile work environment. Thus, the City's motion for summary judgment on Donelson's hostile work environment claim is granted.

## III. Retaliation Claim

Finally, Donelson claims that Sepanik retaliated against her both for her 1999 complaints (which blossomed into a federal lawsuit and were subsequently resolved by the October 2000 Agreement) and for her January 2001 EEOC claim against the City. Donelson alleges that Sepanik retaliated by: (1) unfairly assigning or causing her to be assigned more onerous details than other MTDs; (2) forcing her to take the front lead position on one occasion when she felt uncomfortable performing front lead duties; (3) denying her vacation time when she preferred to use it; (4) denying her one day's paid vacation time (instead of unpaid sick leave) when she left work ill; (5) habitually speaking to her in a hateful manner; and (6) denying her application for promotion to lead driver status (and the associated $1.50/hour increase in pay) for the 2000-2001 winter season. (R. 23, Def.'s Facts ¶¶ 29, 37, 41, 71, 76, 81.)

15

Under Title VII, an employer may not discriminate against any employee who opposes a practice judged unlawful pursuant to the Act. 42 U.S.C. § 2000e-3(a). Because Donelson has not presented any direct evidence of retaliation, we again must turn to the *McDonnell-Douglas* method of indirect proof. 411 U.S. at 802-03. The plaintiff creates a presumption of discrimination if she meets her *prima facie* burden by demonstrating that: "(1) after lodging a complaint about discrimination, (2) only [s]he, and not any otherwise similarly situated employee who did not complain, was (3) subjected to an adverse employment action even though (4) [s]he was performing her job in a satisfactory manner . . . ." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 642 (7th Cir. 2002).

The only material difference between Donelson's sex discrimination claim and her retaliation claim is that in the latter she additionally alleges that Sepanik denied her application for lead driver for the 2000-01 snow season. (R. 15, Pl.'s First Am. Compl. ¶¶ 23-27.) Setting aside for the moment Donelson's failure to secure the lead driver position, which the City concedes could be an adverse employment action, (R. 32, Def.'s Reply Mem. at 3), Donelson cannot establish a *prima facie* case because she cannot show that any of the City's other conduct constituted adverse employment actions. First, as we discussed in addressing Donelson's sex discrimination claim, *supra* at § I, Sepanik's allegedly unfair rotation of details and his hateful tone of voice do not constitute adverse employment actions. *See Minor*, 174 F.3d at 858; *Mangano*, 2002 WL 1821738, at *21. Second, Sepanik did not "force" Donelson to take the front lead; he assigned her the duty then relieved her of the assignment upon learning of her discomfort. At no point did Donelson work the front lead driver position without her consent. (R. 28, Pl.'s Facts ¶¶ 29, 34). Third, since Donelson did eventually receive the vacation time she

requested, we cannot construe Sepanik's initial denial as an adverse employment action—if anything, the DOA management's rearrangement of vacation schedules in order to satisfy Donelson's request was more than accommodating. *See Campbell v. Henderson*, No. 00 C 6837, 2002 WL 1732361, at *8 (N.D. Ill. July 26, 2002). Although some of Sepanik's actions clearly made Donelson unhappy, the incidents about which she complains simply are not materially adverse changes in her employment. *Crady*, 993 F.3d at 136.

Turning to the City's denial of Donelson's application for lead driver in 2000-2001, we believe that the claim is barred by Donelson's waiver in the Settlement Agreement of causes of action related to events on or before October 25, 2000. There is "no question" that a plaintiff may waive her right to bring a Title VII claim as part of a settlement agreement so long as her consent was both voluntary and knowing. *Riley v. Am. Family Mut. Ins. Co.*, 881 F.2d 368, 371 (7th Cir. 1989) (*citing Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 (1974)). Where the plaintiff, with the advice of independent counsel, executes an unambiguously-worded release of Title VII rights, the settlement is deemed voluntary and knowing—and hence, binding. *Id.* at 372-74; *see also Lumpkin v. Envirodyne Indus, Inc.*, 933 F.2d 449, 455 (7th Cir. 1991) (holding that release language in a settlement agreement is governed by contract law; courts should only look beyond the face of the contract if the language is ambiguous). Here, Donelson and the City executed a settlement agreement, effective October 25, 2000, stating that Donelson "waives and forever discharges the City . . . from any and all claims . . . which [she] now has or has ever had against the City . . . whether *known or unknown, suspected or unsuspected* . . . ." (R. 24, Def.'s Mot., Ex. 4, Settlement Agreement ¶ 5) (emphasis added). Donelson utilized the advice of independent counsel and the language of the Agreement is unambiguous; thus any claim

resulting from conduct on or before October 25, 2000 is barred by the Agreement. Further, regardless of the precise date upon which Donelson became aware that she had not been made lead, the undisputed facts show that the list of promoted employees was posted on October 17, 2000. Thus, because the decision to deny Donelson's application for promotion was necessarily made prior to both the posting and to the effective date of the Agreement, we hold that Donelson's claim of retaliation stemming from her failure to secure the lead driver position in 2000 is barred by the Settlement Agreement. Thus, Donelson fails to establish that she suffered an adverse employment action. As a result, she fails to meet her *prima facie* burden on her retaliation claim, and the City is entitled to summary judgment.

## CONCLUSION

It is unfortunate that Donelson's employment with the City has been the subject of two federal lawsuits. The Court urges the City to make every effort to ensure that Donelson meets her full potential as a dedicated City employee. Yet, for the reasons outlined in this opinion, the Court concludes that it must grant the City's motion for summary judgment with respect to Donelson's claims for sex discrimination, hostile work environment and retaliation. (R. 23-1.) The Clerk of the Court is instructed to enter final judgment pursuant to Federal Rule of Civil Procedure 58 in favor of the City.

ENTERED:

_____
**Judge Ruben Castillo**
**United States District Court**

**Dated: July 3, 2003**